All right, this is cause number 19-20152. And I guess it's it's Cohen versus Gilmore. Are the parties ready to proceed? Yes, your honor. Yes, your honor. I'm sorry. I was gonna have my jacket on. I wasn't quite ready. All right. Well, that first one ended pretty quickly. Yeah, quicker than I expected. Thank you. Yeah, well, I'm hoping they set a good example. We'll do what we can. All right, Mr. Gorthy. Gorthy. Yes, sir. You may proceed. All right, your honor. This is Kemp Gorthy on behalf of Jay Cohen. This is an interesting case. It's been going on for quite a while. It started in the state court in Houston. It went into the bankruptcy court in Houston and ended in the federal court in Houston. And therefore, you guys get to look at some rulings that were made by the state district judge that remained interlocutory until the final judgment was entered by the federal district judge. I hate to interrupt you so early, but since you brought up the state court proceedings, do we have everything in our record here on appeal to review what the state court judge did? It seemed like it was a bit confusing. It was very confusing. What happened literally was after the bankruptcy was filed shortly before November of 14, in early 15, Regions Bank, one of the defendants removed the case. And as part of the removal to bring forward the record, they put it on a C. D. And delivered it to the bankruptcy clerk, and it literally got lost. And we went back and forth and back and forth, and we finally got everything. We believe we have everything from the state court in front of this court now. Okay, um, so let me just give you a thumbnail. Mr Cohen contributed. He had four pieces of property, among others that he owned in Houston, and he contributed those into limited partnerships in which his trust was an 80% limited partner. And a gentleman named Matt Dillick controlled the general partner. One of them was an eight acre tract of land, approximately eight acres, located at the intersection of Alabama and Dunleavy. That's in the Montrose section in Houston. It was one of, if not the largest, contiguous tracts of land inside Loop 610 in Houston. It was the sole asset of one of the limited partnerships, Alabama and Dunleavy Limited. Cohen's trust was 80% limited partner. Dillick controlled the general partner. 2008 comes along. The property has over $13 million in debt against it. What happened with those monies is another chapter in this case. The recession hits. Those loans are not going to be renewed. One of them is a $10 million loan to Amagy. The second is a $3 million, secondly, hard money loan by a company called Wedge. Wedge buys Amagy's loan. Wedge is going to foreclose on the property. This is in 09, excuse me, early 09, late 08. Late 09, Dillick is putting off Wedge from foreclosing. He learns that HEB is interested in a ground lease on the property. He's dealt with these before in another Cohen-related property. He knows if we put a ground lease on the property, basically HEB is going to build their store and have a 30-year ground lease of the property. He can take that asset and go to some people that issue bonds, one called Quad Capital, and borrow a lot of money based on that one asset. He learns that he can secure about an $18 million loan on the property. He's got $13.5 million in debt. He can get $18 million out of this. Instead of going forward and doing this through Alabama and Dunleavy Ltd., where Mr. Cohen is an 80% limited partner, would benefit from some of that equity. He sets up this scheme involving the Appleese in this case, Hayden Abercrombie, and a company called Taffy, Texas Abercrombie Family Interests, that is basically set up by Dillick to become a straw man to take title to the property and then do the deal, do the deal with HEB, do the loan, and then divide up the money. That's what happens. The facts, we think, are very clear, or at least certainly presented an issue for the jury as to whether Abercrombie and Taffy knowingly participated in Dillick's breach of its fiduciary duty were the transferees in a fraudulent transfer that could be set aside under Tufta and conspired to defraud the partnership and Mr. Cohen and to breach the fiduciary duty. If you look through the recitation of the facts, one of the things that Dillick first had to do was to put off the foreclosure. He goes to another hard money lender, Adam Acquisition, to borrow $13.5 million. He personally guarantees it. He puts up $2 million, $1.25 million as a CD, as additional collateral, $750,000 as prepaid interest. He's the guy in charge of the loan, does everything, and there's a loan made to, quote, Taffy, but all orchestrated by Dillick. They pay off wedge. Taffy gets titled to the property, and then they go forward and do the permanent loan once the HEV lease is in place, and they get $19.9 million out of that. Of that, $1 million, you look at the settlement statement, and it shows as one of the payees at the closing, $1 million going to this thing called European Capital Fund, which was one of three entity-limited partnerships of Taffy. Taffy's limited partnerships were Hayden Abercrombie's three daughters and then three ostensible entities, two of which were never even formed. The only one that was formed was European Capital Fund. So you have on the settlement statement, $1 million goes into an account of European Capital Fund that was set up at Bank of America by a guy named Luis Bodmer, who is an associate of Dillick, has nothing to do with European Capital Fund, but goes in and signs bank documents saying that he is the manager of it. The money comes into this account he controls. He then immediately sends it to another Dillick-related entity. It's the company that owns Vera Peretti's in Houston, King Cross Venture, another crony of Dillick, a guy named Michael Horan. It sits there for a day, and then it goes to another Dillick entity, Mid-Rise Builders, and then ultimately to Commerce Equity. So we have the evidence that the only, quote, consideration that was paid by Taffy to Alabama Dunlevy Limited for the transfer, you'll look at it, you should look at it. It's an exhibit. I don't have the number in it. I'll get it for you in a second. It's an amazing promissory note. It is a non-recourse, no personal liability note, unsecured, and it's just to make everything clear, it has a sentence at the end of the note that says, notwithstanding anything herein to the contrary, no personal liability shall be borne by maker in the event of default. So literally, we have this piece of property, your honors, that Dillick knows is worth over $18 million. He ultimately gets $19.9 million. There's a lot of equity in it, and instead of leaving it with Alabama Dunlevy Limited, he puts it into this thing called Taffy and splits up the proceeds with Mr. Abercrombie and Taffy. And if you look through the evidence, we think it's very clear all of the elements of the causes of action that we asserted. The primary one comes out of an old Texas Supreme Court case, 1942, Kinsbaugh-Tool, knowing participation or aiding in a breach of fiduciary duty. The elements are existence of a fiduciary duty, knowledge of the fiduciary relationship, and awareness of participation in it. Dillick was the manager of the general partner. That's number one. He clearly had a fiduciary duty. Abercrombie acknowledges in his briefs that he knew Dillick was the general partner, knew he had a fiduciary duty. And then the third is awareness of participation. And that, Your Honors, that is something that the all reasonable inferences from the stack of evidence on this crazy scheme where the money ends up split between Abercrombie and Dillick clearly supports a jury finding that he knowingly participated in that breach of fiduciary duty. The same thing would establish the elements of actual intent to defraud under a tough to claim. I think I'm winding my time up here pretty quick. The notice of Liz Pendens, we filed a notice of Liz Pendens. The judge expunged that. We've appealed from that. We were required under the statute to present a case showing that we had the probable validity of our claim. We've discussed in our brief that there's no Texas case that says what that means. We believe it's most analogous to a temporary injunction type standard, in which case the standard we believe should be that we have to have presented evidence that shows a prima facie case, which we did. The response to the expungement motion included all of the summary judgment evidence. So we would ask the court to reverse the summary judgment and set aside the expungement of Liz Pendens and remand the case to the federal district judge in Houston for a new trial. What would be the net effect of reversing on the expungement? Would that just place the Liz Pendens back on the property? Yes. I understand it is now in the hands of the third party. Or would it be a case where monetary damages would suffice? Monetary damages is going to be an issue because we have Taffy that's a piece of paper as one defendant. And then we've got the estate of Mr. Abercrombie, which I think is not much because of trusts are the primary asset of Mr. Abercrombie and his family. I don't know. It's my three minutes or four minutes. Is that for my time in the in the 15 or the total 20? I'm so sorry. 15. Okay, great. Okay. I was hurrying up there. Yeah. And so I mean, we don't know anything about the acquisition of the property in the appellee's brief. They ask you to take judicial notice of it. They cite, I think, to a recorded document. We don't know what kind of document it is. We don't know who it was sold to. We don't know, for example, if it was sold through a title company. My understanding is that a title company these days is not going to ensure a conveyance based solely on the expungement of a notice of lisbettenance. They're going to require that the case be dismissed because they know that if the case is still active, it's expunged. Who knows what's going to happen? It could come back to haunt the buyer in that case. And that's the only mechanism under Texas law to protect someone like your client who had a lisbettenance that was then traditionally expunged. There is no statutory means to have an interlocutory appeal. It's not in Chapter 51 of the Civil Practice and Remedies Code. You cannot do an interlocutory appeal of expungement of a notice of lisbettenance. Cannot do it. You can do a mandamus. We did mandamus on earlier cases, as counsel pointed out in the brief. One of those was denied. I mean, I think the law is you can do it by mandamus and you can do it the way we've done it, and that is once you have a final judgment, all those preliminary rulings in the court are now within the judgment, become final, and can be appealed. And if you're a buyer and you buy a piece of property that has had a lisbettenance on it, and so you have notice of the litigation, you have notice of what the claims are, and it has been expunged, but that case is still pending, the defendant who secured the summary judgment has not taken to sever it and make it final, then the buyer takes with notice that something like this could happen. And this is really the only way that Mr. Cohen is ever going to get any relief is to be able to, again, acquire title to that property. All right. So maybe I misunderstood. I guess because I thought I heard you say that if you get an opportunity to go to trial, you could see some monetary damages. But now what I'm hearing is you're looking to get title to the land back. Yes, sir. Yes, sir. That's the relief that we would like. I mean, monetary damages, like I said, we got a defendant that's Taffy. Taffy has nothing. Taffy's a piece of paper. Mr. Abercrombie has passed away, and my understanding is that his estate is tied up in trusts. And so really, in terms of getting any relief for Mr. Cohen, we need the summary judgment reversed, the notice of lisbettenance cancellation reversed, and go back to trial against the two defendants. And we would also have to name at that time whoever currently has title to the property. I have a question. It's a weird procedure. Everything you're challenging happened in the state court years ago. Yes, sir. It's removed for bankruptcy. All Judge Bennett does with these claims is dismiss them under Rule 12. And I don't think the defendants were even really appeared in the federal court. Did you have to object to that Rule 12 that Judge Bennett issued? The Ruletail motion was filed only on behalf of Dillick and the Dillick defendants. It was not filed on behalf of Taffy or Abercrombie. And then the order that he signed... But the order he signed did encompass. It encompassed them, but all it says is, to the extent that the cross-claims have already been resolved by summary judgments granted by the district court, the motion is granted with regard to those entities. And I think that it was a ministerial act. I mean, the decision... Abercrombie and Taffy were, quote, out of the case because there was a take-nothing judgment had been entered earlier. And I understand that, but it just seems weird that this is really... You know, once a federal case is removed on bankruptcy grounds and the bankruptcy connection goes away, the federal court can keep the case. It still has jurisdiction. But our case actually says the court can, has discretion to send it back to state court. It just seems to me this is more of a state court matter. But anyway... It didn't do it. And this is really the only relief that we have, is this appeal to this court. I'll say I'm done. I'll speak after Mr. Crump. Thank you so much. All right. Mr. Crump? Yes, may it please the court. My name is Randy Crump. I represent the Appalese, the estate of Robert Abercrombie and Taffy. I want to address one thing initially, because it's been raised by at least two of you already, which is what happens in the event that this summary judgment is overturned and sent back down. And Judge Englehart hit, went right to the heart of the issue, is this property was sold. It was sold years ago to a third party who paid good value for the property that they purchased. They purchased it at a time when there was not a Liz Pendens in place. And I suppose I'll go ahead and go directly to my section on the expunction of the Liz Pendens, because I think that that's most important. And it's particularly important here where the property has been sold to a third party. We all know that law doesn't like a restraint on alienation of the property. And what we have here with the Liz Pendens, it's expunged and then it comes back refiled later on is effectively a restraint on alienation. There needs to be some finality when you have a Liz Pendens issue. And that finality could be handled through the form of a mandamus, or at least you would have another decision on whether or not the Liz Pendens was valid or not. In this case, Mr. Cohen had filed a mandamus on the trial court judge when the prior Liz Pendens was filed and expunged. It went up on appeal to the Court of Appeals in Houston. The Court of the expunction should be vacated and sent back down for a determination based on an evidentiary hearing. And the specific provision of the statute we were dealing with is Texas Property Code 12.0071. And the second part of subsection C is that a court shall expunge a Liz Pendens if the claimant fails to establish by a preponderance of the evidence the probable validity of a real property claim. That was the issue that was before the trial court judge, the state trial court judge, when the motion for expunction came back up. I took a look to see what the appellants had produced or pointed the court or directed the response to its burden to show the probable validity of a real property claim by preponderance of the evidence. The entirety of the evidence pointed to by the appellants is listed on page 42 of their brief. And it's in a single sentence. It said Cohen's response to Taffy's motion to all of Cohen's summary judgment evidence. And then it's cited to three pages of the record. There was no reference to any evidence, especially probative evidence of a probable validity of a real property claim. That's a no evidence that the appellants have pointed you three to to support its burden. Now, another thing to note is that on the expunction order, the appellate court, sitting as you are today, is to review that under an abuse of discretion. And the abuse of discretion in this instance requires the appellate court to view the most favorable to the trial court's actions. So, it's our contention that, it's the appellate's contention that the appellants have not pointed you to any evidence to support its burden of proof on the expunction. And that the expunction of the Liz Pendens was valid when made back in 2014 by the trial court judge and has been relied on and was relied on for the following five to six years after that expunction took place back in 2013. I think it's clear based on the lack of evidence to support the burden of the appellant that the expunction orders should not be reversed on appeal. Now, I got way out of way out of order, but I wanted to address the expunction questions first since they were raised. And I think it's interesting that you got out of order because, so are you acknowledging that if the Liz Pendens is not restored, then there's really no practical relief for Mr. Cummings? I would say, well, I don't know your honor, frankly, what the relief would be. We know that a third party now owns the property, is that right? We know that a third party now owns the property. And we also know that another thing I should mention, I don't know that it's legally significant, but Mr. Cohen had Liz Pendens own this property that he voluntarily withdrew in order to allow the HEB lease to be executed and the permanent financing to be placed on the property. So it's not a surprise. I think, and I hate to ascribe motives to anything that anyone does, but by voluntarily withdrawing the earlier Liz Pendens, allowing the property to be sold in the lease signed, and then filing another Liz Pendens, looks to me to be somewhat suspicious on the part of Mr. Cohen and what his motives were. But we can't deal with that. Motives are not here. What we have to look at is the evidence. The other point that I wanted to address was also something raised by lead point, but it ended up going second. I think even Mr. Gorthy would concede that this record was a mess. And I thought that me not having been a part of this matter in the trial court level would be a disadvantage to me. But actually when I started thinking about it, I realized that it was truly an advantage because I'm looking at the papers the same way that the three of you are looking at the papers. I have to look at them with a critical eye to see what is in there. I'm not burdened by my memories of what took place back in 2013 and 2014. I'm looking strictly at the paper. So what I did in looking at this case when it came to me was look at the evidence that was presented. The primary evidence that's relied on by the appellants and is cited time and time again as support for its position of proof of certain elements of his claims are the documents that are base labeled numbers 9770 through 11025. That's 1,255 pages of documents that are referred to over and over and over again. Now, I think we all know, and I don't think it's contested, that it's the appellant's burden to bring a full and complete record to the appellate court. In fact, this court, the Fifth Circuit, has said that our review is limited to the examination of materials before the lower court at the time the ruling was made. Subsequent materials are irrelevant. Now, the 1,255 pages that are referred to time and time again by the appellants were not on file with the trial court at the time it entered the orders granting motion for summary judgment and the order expunging the Liz Pendens. That order was signed, I believe, on November 4, 2013, that order. There actually were two or three orders that were signed on that day. The exhibits, 1,255 pages of them, were not filed with the trial court until a month later, December 4, 2013. So, if you take a look at the record as it exists, those documents weren't before the trial court and can't be considered on appeal. Now, the appellants cited a couple of cases for the proposition that a trial court can allow late filed documents. Now, I looked at those two cases and they're interesting cases because I didn't know that there was any way that a trial court could allow a month after its ruling to allow evidence to come in and be properly considered. When I looked at these cases, I realized that they don't hold what the appellants say they do. The first one is hydrocarbons. When the carpenter filed a motion for summary judgment, the Cimarron attorney failed to calendar the hearing on the motion for summary judgment. Subsequently, two days before the hearing, he doesn't have a response on file. So, when he calls the attorney for the movement and asks for a continuance, the attorney said no. So, the Cimarron attorney then filed a motion for leave with the trial court along with a response and motion for summary judgment. Because it was filed two days before the hearing rather than more than seven days before the hearing, it was deemed a late filed pleading. But when we look at late filed pleadings, I think that's what the courts are considering, that it's filed less than seven days or 21 days, not when it's filed a month after the hearing took place. The Court of Appeals, the Intermediate Court of Appeals applied a standard to it to determine whether there was good cause for the late filing. Then it went up to the Texas Supreme Court. The Supreme Court applied a different rule or a different definition of good cause, but held that the movement did not show good cause for the late filing of the pleadings and denied the appeal and sent it back. That's one instance where the late filed pleadings were at least reviewed by a Court of Appeals and ultimately Texas Supreme Court. The other case is Garcia versus Garza. This is a Texas Appellate Court opinion out of San Antonio. In this one, one party filed a motion for summary judgment, the other side responded timely, and then the movement, in connection with the reply to the response to the motion for summary judgment, submitted some additional proof. On appeal, the issue was whether or not that proof was timely submitted because it was not submitted at least 21 days before trial, submitted right before the hearing date. In that one, the Appellate Court conceded that there are instances where you can do late filings, and particularly in this instance, where it's in reply to a response, but that case does not rule what happened here, where we're talking about 30 days after the hearing that evidence is coming into the record. The last thing is, and we pointed that out, and the Appellate said, well, then you waived it. You know, if you didn't object at the time, and they cited a case, Height versus Coley-Jessen, and this was a case where the court did find that there had been a waiver, was important. What they said in their opinion, they found that the argument had been waived because at the hearing on the motion for summary judgment, the party waived the objections by failing to object to the materials or the manner in which they were filed. That was a waiver because at the hearing, there was no objection. The evidence that we're contending shouldn't be considered was filed 30 days after the hearing. We didn't have an opportunity or a need to, didn't have an obligation to respond at that point or file an objection because our summary judgment had already been granted. The court was not going to reopen, and there wasn't a motion to reopen or reconsider the summary judgment after these 1,255 pages were filed. So, it's our contention that that evidence was not properly before the court. And I know that the Appellants have said that, well, that's a procedural issue. And it could be deemed a procedural issue, but procedure is important in these types of cases, particularly when you're reviewing a decision on a motion for summary judgment, where the record is what is the only thing that you can look at. Now, Mr. Gorthy has quite the handle on the facts of what happened, and his interpretation of those. But he has to have documents that support all of those elements. And when you take a look at the pleadings, when asked to point to the evidence that supports those allegations like intent, he points to the documents that were filed after the hearing, almost exclusively. But they were part of the record on appeal? They are part of the record on appeal, but they were not part of the record at the time the trial judge ruled on the motions. Did you object to them being made a part of the record on appeal? On appeal? Yes, sir. No, not on appeal. I did not, because they were part of the entire record of the case. They just, but there were thousands of pages that were, that became part of the record of the case after these orders were signed. These orders were signed in 2013. This case continued on for another six years. There were many, many matters that were, that went into the appellate record that had nothing to do with the orders entered by the trial judge back in 2013. But you filed no motion to strike it from the record and you filed no objection to it being made a part of the record? I didn't file an objection, Your Honor. I did not. Mr. Gorthy was putting together the record. These, he had all these documents. I was, like I said, I was not a part of the trial court team. I didn't realize until after I got into it and looked at Mr. Gorthy's pleadings, I didn't know what he was going to rely on. I didn't know that there was, would have been any reason to object to him at the time, because they were part of the entirety of the record of the case, which went up on appeal. It wouldn't have been until I got Mr. Gorthy's brief that I knew he was relying on documents that weren't before the trial court. Does that, I hope that makes sense. I wouldn't, had I looked at it, I wouldn't have known what, if any use, these documents were going to be put until I was aware, until I was made aware of that by reading Mr. Gorthy's brief. So, that's the issue with the documents. There are, there is the issue of damages too, that I was going to address. But actually, the damages issue, the damages issues are there. They're, I think they're pretty straightforward. In order for there to be any claim at all, the plaintiff has to prove damages, right? So, in this instance, there was an objection or a base, as a basis for the motion for summary judgment that was granted. And that was a no evidence motion for summary judgment. A reference to a lack of damage is proven by the plaintiff. And there's evidence in there of an appraisal sometime before the relevant date. There is evidence in the record of, and I think after the H-E-B lease was in place, but there was no evidence in the record of the fair market value as of the date of the Torches Act. And that would either be the date when the earnest money contract was executed to Abercrombie, or the date that the property actually was conveyed to Abercrombie. But there's no evidence in the record of what the fair market value of that property is as of that date. That is a fatal flaw. And without that information, it would be impossible for the plaintiff to prove damages. In this instance, where the trial court granted summary judgment without pointing to specifics, I think it's incumbent on this court to not overturn the decisions of the trial court unless there is some evidence to support it and raise a material issue of fact on each particular element. Thank you. Your time has expired. Yes, sir. I'm going to go in reverse order. Damages. Look at the settlement statement in June of 2010. $4 million the sellers walk away with. $4 million. Cash. That's easy proof of statement. This is Taffy's financial statement. Their admission, they said the property is worth $26.8 million. There's evidence of damages there. The record, this is explained in our reply brief, there was a protective order entered and documents designated as confidential could not be filed with the court until after an opportunity for the party designating it to object. So we filed the motion. We filed the summary of the evidence. We did not file the 1,200 pages. We delivered them to the court. We delivered them to all the parties. The parties obviously had it because they made specific objections to the exhibits. And then afterwards, we filed a motion for leave to file them after parties had a chance to say whether or not they objected to the confidential information, no objections having been made. The court entered an order saying everything is filed and is deemed timely fine. The record is this. This is the double pages. These are the 1,200 pages. The trial court had those at the time of the hearing. All the parties had them at the time of the hearing as a procedural matter because of the protective order. They were, quote, filed later, but the court deemed them timely fired. That's a non-issue. The list pendants that we withdrew, this is not in the record, but you look at the Adam acquisition as part of their had a deed in lieu of foreclosure. And if their loan was not paid off within X days, they were going to take the property by foreclosure. We agreed to withdraw the list pendants in order to let the thing close because we could get title back from Taffy easier than we could get title back from Adam acquisition, who was not a party to the case. We let the loan close. They paid off acquisition. We put the list pendants back in place and went after Taffy for that. The other mandamus that Mr. Crump was talking about, we filed a writ of mandamus when there was an expungement of a list pendants on a different property completely. We never filed a writ of mandamus on the Alabama property. We filed it on a Bissonette property. It was granted the first time around because the trial court said we didn't plead a real property claim. Court of Appeals disagreed, sent it back, and then we had a hearing, granted again. We filed a mandamus and we got a one-page order denied, no explanation. That did not have to do with Alabama property. In terms of our response to the motion for expungement, we directed the trial court, we incorporated by reference in the response, all of this, all of the summary judgment evidence. And so to the extent that we have put forward summary judgment evidence, uh, raising a genuine issue of material fact on our, um, on our affirmative claims, we believe we also put forth enough evidence to carry our burden on the motion to expunge, to set forth the probable validity of our real property claim. Um, very first point that, that counsel made, it, look at the, the mandamus, unfortunately, probably what the Texas legislature needs to do, but they didn't do, is include under chapter 51, uh, as a list of things that are subject to interlocutory appeal, expungement of a notice of list pendants. It's not fair. There, there is no specified remedy if the, if the list pendants is expunged. Under counsel's arguments, theoretically, you could have a notice of list pendants expunged, you file that order, and the next day you sell the property to somebody else. And under their argument, the, the, the owner of the property is cut off. It cannot have any kind of appeal. And, and, and we think that that's not the law. Uh, we have proceeded correctly here, and this court has the, has the jurisdiction and the ability to set aside both the summary judgment and the expungement. And we've asked you to do that. Thank you. I can't, I cannot hear Judge Graves. Can't hear, because I muted myself. Oh, I'm so sorry. I didn't know if you were talking to me. I appreciate your reminding me. We, uh, we're going to take this matter under advisement. And Mr. Gorthay, Mr. Crump, you are free to go. Thank you very much, Your Honor. Thank you, Judge. Thank you.